UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOSE DEJESUS GRANADOS,

                       Petitioner,

     -against-

HON. MADELINE SINGAS, District Attorney,
County of Nassau and MICHAEL SPOSATO,
Sheriff, Nassau County,

                       Respondent.
------------------------------------------------------------X

PETITION FOR A WRIT
OF HABEAS CORPUS

Case No.
Refer to: Hon. Joanna Seybert

Upon the Petition of Jose DeJesus Granados, by his attorneys, the Law Offices of Thomas F. Liotti, it is respectfully alleged that:

1.    I am counsel to the petitioner and submit this petition in support of his application for a *writ of habeas corpus* pursuant to 28 *U.S.C.* §§2241 and 2254. The facts and circumstances set forth herein are derived from judicial records (in particular transcripts from the Nassau County, State of New York plea on November 12, 2009 and sentence on January 8, 2010, both before Hon. James P. McCormack and SCI number 2400N/09; the Appellate Division, Second Department opinion under Appellate Division number 2015-08389 and attached exhibits.

2.    A motion pursuant to CPL §440.10(1)(h) was filed in State Court by Petitioner's counsel on April 13, 2015; the People filed an affirmation in opposition on May 6, 2015 and the Petitioner by counsel replied on May 18, 2015 and the State Trial Court denied the application by Hon. Angelo Delligatti on August 19, 2015. The People filed a Notice of Entry on September 1, 2015. Those documents are attached hereto as Exhibits "A", "B", "C" and "D".

3.    The Petitioner by this counsel then sought leave to appeal in the Appellate Division pursuant to CPL §§450.15 and 460.15 and from a denial of the petitioner's CPL

1

§§440.10 and 440.20 motion as per CPL §450.15(1) and (2). The People then opposed that

application with an Affirmation in Opposition dated September 18, 2015; the Petitioner replied

on September 23, 2015 and on January 22, 2016 the Appellate Division issued its decision and

order on the application denying the leave application to appeal from the denial of the

Petitioner's CPL §440 motion in the Trial Court (Slip Op. No. 2016 NY Slip Op 62178(u)).

These exhibits are attached hereto as Exhibits "E", "F", "G" and "H" respectively (duplicate

exhibits from these documents have been excluded).

      4.     A criminal complaint was initiated against the Petitioner in this Court on March

12, 2015 at which time the Petitioner was arrested and incarcerated on a charge of wrongful re-

entry pursuant to 8 *U.S.C.* §§1326(a) and 1326(b)(2) (see Exhibit "I" attached). He was then

indicted in this Court in or about April 7, 2015 pursuant to 8 *U.S.C.* §§1326(a), 1326(b)(1) and

18 *U.S.C.* §3551 (attached as Exhibit "J"). He has remained incarcerated at the Nassau County

Jail ever since. He has, until the last court appearance when he was denied bail, waived speedy

trial compliance during the pendency of his State Court applications. The federal prosecutor is

AUSA Grace Cucchissi. Our next federal court date is scheduled for May 9, 2016. All matters

in the State Courts have been concluded or "exhausted".

      5.     The Petitioner is imprisoned at the Nassau County Correctional Facility, without

bail and pursuant to the aforementioned federal charges pending against him.

      6.     This is a petition brought pursuant to 28 *U.S.C.* §§2241 and 2254 in that the

petitioner, by his counsel, contends that his underlying State Court conviction was illegally and

unconstitutionally obtained against him and as a result, his deportation, exclusion and removal

from the United States of America were also illegal and unconstitutional as are the present

charges against him alleging wrongful re-entry into the United States of America. See Rule 1 Governing Sections 2254 Proceedings for the United States District Courts (as amended on January 22, 2014).

7.    As the enclosed exhibits indicate this is a classic case of wrongful prosecution of the petitioner for statutory rape in the Nassau County Court before Hon. James McCormack, an otherwise excellent former prosecutor, defense lawyer and highly respected Judge. Yet, even the best of lawyers and judges may err or in retrospect as the law changes, their former practices and procedures, may fall short of new standards. It also happens that experienced judges may rely upon counsel, whom they believe to be as experienced as they are, only to find out later that counsel while experienced or inexperienced, was neglectful in advising clients of their rights.

8.    In my experience, this Court has shown itself to be a great protector of Constitutional rights and liberties[1].

---

[1] See Harris v. Kuhlmann, 346 F.3d 330 (2003), New York Law Journal, October 20, 2000 at 43 and 44. Sixty page Opinion by the Hon. Joanna Seybert, granting defendant's *pro se Writ of Habeas Corpus* based upon racial discrimination by the prosecutor during jury selection. See, also, Robert E. Kessler, Murder Verdict Overturned Judge Says Convict Almost Certainly Guilty, But Rules His Rights Were Violated When Blacks Were Kept Off Jury; D.A. Appeals, Judge Throws Out Conviction, Says Blacks Kept Off Jury In '83 Murder Case, Judge: Due Process Violated In Murder Case, Newsday, September 26, 2000 at 1, A3 and A51; Michael A. Riccardi, Excluding Black Jurors Triggers New Trial In 1983 Murder Case, New York Law Journal, October 18, 2000 at 1 and 2; Leigh Jones, Reconsideration of Habeas Issue on Murder Conviction Denied, New York Law Journal, May 20, 2002 at LI-3; New York Law Journal, May 21 2002 at 1, 17 and 27, decision denying writ of habeas corpus on grounds of competence and Robin Topping, Around the Island, Crime and Courts, Jury Selection Issue In Decades-Old Case, Newsday, June 2, 2002 at A28. See, also, Giano v. Kelly, No. 89-CV-727©, 2000 WL 876855, at 9 (W.D.N.Y., May 16, 2000). See Thomas F. Liotti, Civil Rights in Criminal Cases, The Attorney of Nassau County, October, 2000 at 7. See also, Harris v. Kuhlmann, 115 F. Supp.2d 326 (E.D.N.Y., 2000) and 346 F.3d 330, 349 (2d Cir., 2003). Granting of *writ of habeas corpus* affirmed and remanded for a hearing on Batson v. Kentucky, 476 U.S. 79 (1986) claims. Mr. Liotti was trial and appellate counsel to Mr. Harris during a murder trial and an attempted escape case. The District Court by Judge Seybert granted the writ which was affirmed by the Circuit;

Robert E. Kessler, <u>Race Ruling Overturned, Exclusion of Jurors at Issue</u>, Newsday, October 14, 2003 at A1; Leigh Jones, <u>Panel Affirms, Orders Hearing on Use of Race in Juror Challenges</u>, New York Law Journal, October 15, 2003 at 1 and 2. Also reported as the Decision of the Day, New York Law Journal, October 21, 2003 at 1, 18, 24, 25 & 29. *Writ of habeas corpus* affirmed on <u>Batson v. Kentucky</u> grounds (prosecutor exercises peremptory challenges in a racially discriminatory manner). Mr. Liotti made the objections in 1984 and 1985, sixteen months before <u>Batson</u> was decided by the Supreme Court of the United States. See Zachary R. Dowdy, <u>Around The Island, Crime and Courts, Judge Must Explain an Old Jury Choice</u>, January 28, 2004 at A22.

See also, <u>U.S. v. Crowley and Valjato</u>, 236 F.3d 104 (2nd Cir. 2000), 79 F. Supp. 2d 138 (E.D.N.Y. 1999) (Judge Seybert) New York Law Journal, December 22, 1999 at 1, 25, 40, 41 and 42. Title: <u>Jury Charge On Voluntary - Intoxication Defense Is Needed to Allege Attempted Sexual Abuse</u>. Defendants, Midshipmen at the United States Merchant Marine Academy were convicted by a jury of attempted aggravated sexual abuse and attemper sexual abuse. The trial court denied defendants' requests to charge the jury on voluntary intoxication. The instant court concluded that the trial court erred in denying this request, because these attempted crimes were specific intent crimes. The Court found that this error was not harmless because a voluntary intoxication defense directly targeted] an essential element of...burden of proof: specific intent to commit the attempt crimes alleged. The Court held that the evidence was sufficient to permit the jury to infer that defendants were intoxicated and as a result defendants lacked the ability to form the specific intent to commit the crimes. Therefore, it granted the motion for a new trial." See December 13, 1999, Memorandum and Decision by Hon. Joanna Seybert dismissing the indictment on the defense motion and Kessler, Robert E., <u>Judge: I Made a Mistake, Throws Out Sex Abuse Convictions of Kings Point Cadets</u>, Newsday, December 16, 1999 at A8 and Wise, Daniel, <u>Absence Of Details Leads Judge To Vacate Sexual Abuse Verdict</u>, New York Law Journal at 1, 2 and 42. See, <u>VICI</u>, New York State Association of Criminal Defense Lawyers Newsletter, Mouthpiece, Vol. 13, No. 1, January/February, 2000 at 26. The Government appealed from a decision of the Hon. Joanna Seybert of the Eastern District of New York wherein she dismissed the indictment and the pleadings and at the same time reversed herself in another respect in that she did not charge voluntary intoxication to the jury. In this respect she granted a new trial. Legal Briefs, <u>New Trial Ordered For Kings Point Midshipmen</u>, The Attorney of Nassau County, January, 2001 at 5. Report of new trial as a news item, see Today's News, New York Law Journal, January 3, 2001 at 1. See also, Katie Thomas, <u>Ex-Cadets To Get New Trial, Court Rules Judge Limited The Defense In Sex Abuse Case</u>, Newsday, December 28, 2000 at A26. See Robin Topping, <u>Split Verdict In Cadet Sex Case</u>, Newsday, November 28, 2001 at A14. On the re-trial, Valjato was not represented by Mr. Liotti, but by John Jacobs of New York City. Valjato was found not guilty on both counts while Crowley was found guilty of one court of attempted aggravated sexual abuse and acquitted of attempted sexual abuse.

See also, Mr. Liotti quoted in Law Journal Profile of new federal judge. See McMorris, Frances A., <u>Seybert's Untypical Route To Federal Bench</u>, New York Law Journal, February 15, 1994 at 1

9.      As shown herein, this petitioner does not speak English and had an eighth grade education from El Salvador.

10.      While our Courts have not given retroactive effect to *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010), it is clear that this petitioner was not only not apprised of the consequences of his plea, namely deportation, but also, not apprised of his prohibition against re-entry and that if he wrongfully returned to the United States that he could be charged with a federal crime of wrongful re-entry, incarcerated and held without bail.

11.      The petitioner here has asserted his actual innocence based upon a supporting affidavit of Leydi Cruz, the sister of Mayra Cruz who is also the mother of the former underage adolescent, Michelle Reyes, with whom the petitioner was accused of statutory rape. Yet, a physical examination after the alleged statutory rape showed that Reyes was still a virgin. These medical reports were not disclosed to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. See also, *Kyles v. Whitley*, 514 U.S. 419 (1995); *U.S. v. John Gil*, 297 F.3d 93 (2002) and <u>*People v. John Daly*</u>, 20 A.D.2d 542, 799 N.Y.S.2d 537 (2nd Dept. 2005); 5 N.Y.3d 882 (2005); 57 A.D.3d 914 (2d Dept., 2008) and 14 N.Y.3d 848 (2010). Defense counsel at the time failed to make CPL §240.20 Demands and did not file any motions. Defense counsel failed to interview alleged witnesses, visit a purported crime scene or hire an investigator.

12.      Ms. Cruz's affidavit also states that her niece, Michelle Reyes, has been diagnosed as a paranoid schizophrenic and bi-polar. She appears to have fabricated this case against the petitioner but also made similar allegations against other men as well.

---

& 6.

13.     Since the plea and sentence before Justice McCormack occurred in 2009 and 2010

under a Supreme Court Information (S.C.I.), there were no grand jury minutes to inspect or

review.  Since the defense never interviewed Reyes we do not know whether she was ever asked

to submit to a lie detector test by the People.

14.     Her motive and her mother's to fabricate a story against this petitioner is

explained by his rejection of both of their romantic intentions.

15.     The petitioner has a family in El Salvador where gangs reign.  He escaped from

there after members of his family were killed and he was threatened with death if he did not join

the gangs there including MS13 and the Latin Kings, to name but a few.

16.     The petitioner's former lawyer did not explain to him the possibilities of success

at trial or how Ms. Reyes might be impeached[2].  He never explained the petitioner's right to a

trial; discovery; motions; hearings or an appeal.

17.     This Court is well aware of shortcomings of assigned counsel and the County and

State's failure to comply with the mandate of *Gideon v. Wainright*, 372 U.S. 335 (1963)[3].  Upon

---

[2] See, Liotti, Thomas F., Zeh, Christopher W. and Lapidus, Dr. Leah Blumberg, Cross-Examining Children in Sexual Abuse Cases, The Attorney of Nassau County, July, 2000 at 5, 12, 13 and 18 and The Cross Examination of Child Witnesses, Verdict, a Journal published by the National Coalition of Concerned Legal Professionals, Vol. 6, No. 4, October, 2000 at 11-21. See Also. March 28, 2000, NYSBA In Print, Resources For Journalists On The Legal Beat - Winter, 2001, Cross-Examining Children In Sex Abuse Cases.

[3] See Liotti v. State of New York, County of Nassau, et al., E.D.N.Y., Docket No. CV 00-2335.  Magistrate Michael Orenstein and District Judge Joanna Seybert.  See Riccardi, Michael A., Class Action Lawsuit Challenges 18-B Fee Structure, New York Law Journal at 1 and 2.  On behalf of himself and all attorneys and counselors at law, Mr. Liotti commenced a lawsuit against the defendants, alleging that Article 18-B of the County Law of the State of New York should be declared unconstitutional because the defendants have not lived up to the mandate of Gideon v. Wainright.  See, New York City News, National Lawyers Guild–N.Y.C. Chapter, February, 2000, Call to Raise Assigned Counsel Rates.  Article in part about Mr. Liotti

and his lawsuit; Catherine Schmoller, Editor of the Attorney of Nassau County, <u>Assigned Counsel Fees: 'You Get What You Pay For,'</u> February, 2000 at 3, 15 & 16; Topping, Robin, <u>A Lawyer's Case For More Pay, Says Court-Appointed Attorneys Underpaid</u>, Newsday, February 9, 2000 at A24; Riccardi, Michael A., <u>Second Lawsuit Challenges Rule 18-B Fee Schedule</u>, New York Law Journal, February 22, 2000 at 1 and 4; Kleuwer, Susan T., <u>Board of Directors Take Action</u>, Nassau Lawyer, Journal of the Nassau County Bar Association, March, 2000, Vol. 48, No. 2 at 1 & 22; Liotti, Thomas F., Letters to the Editor, <u>System Breakdown Seen As Imminent</u>, New York Law Journal, March 13, 2000 at 2; Editorial, <u>Don't Make Paupers of Lawyers Who Help the Poor</u>, Newsday, March 20, 2000 at A 26; Schmoller, Catherine, (2 articles), <u>The Right to Counsel</u> and <u>Suits Seek to Force Fee Hike and Report: Give Assigned Counsel a Raise</u>, The Attorney of Nassau County, March, 2000, Vol 6, No. 19 at 1 and 12; <u>NCBA Lobby for 18-B Fees</u>, Nassau Lawyer, April, 2000 at 3; Asarch, Joel K., President's Column, <u>Are We Doing Enough For Our Members</u>?, The Nassau Lawyer, April, 2000 at 4; Caher, John, <u>Proposed Budget Has No Increase For 18-B Fees</u>, New York Law Journal, April 6, 2000 at 1 & 8; Asarch, Joel K., President's Column, <u>Board United In Seeking Increased 18-B Fees</u>, May, 2000 at 4 & 22 and Collins, Richard D., <u>Update On Assigned Counsel Rates: Part II</u>, May, 2000 At 17, The Nassau Lawyer; Criminal Practice Guide, May 17, 2000, Vol. 1, No. 5, published by Pike & Fischer, Inc., a subsidiary of the Bureau of National Affairs, Inc., a supplement to The BNA Criminal Practice Manual and The Criminal Practice Report, see <u>New York Attorney's Effort to Raise Fees, Obtaining Funding to Pay for Better Indigent Defense Services</u> at 4. This entire issue of the Guide is devoted to litigation around the country on assigned counsel fees. See also, Kessler, Robert E., <u>Widows Fight For Lawyer's Fee, Say Only Their Counsel Earned It</u>, Newsday, May 18, 2000 at A8 Y A60. See also, Zachary R. Dowd, Around The Island, Crime & Courts, <u>Lawyers-For-Poor Plan: An "Illusion of Justice</u>?" Wednesday, June 28, 2000 at A303. Full Amended Verified Complaint and settlement papers reprinted in the New York State Bar Association, Criminal Justice Section Journal, Summer, 2000, Vol. 8, No. 1. Cited at 11, footnote #24 of the <u>New York State Bar Association, Special Committee on Public Trust and Confidence in the Legal System, Report to the House of Delegates: Enhancing Public Trust and Confidence in the Legal System</u>, October, 2000. Peter Sloggat, <u>Task Force To Study Fee Hikes</u>, The Attorney of Nassau County, January, 2001 at 4. See, New York Law Journal, March 26, 2001 at 35, col. 3 for a copy of Decision dismissing the action as to the State and Leigh Jones, <u>State Dismissed As Party In 18-B Suit</u>, March 26, 2001 at LI-2. See also, Thomas F. Liotti, Post Opinion, <u>N.Y.'s Coming Guarantee: An Unfair Trial</u>, Op-Ed article appearing in the New York Post on Wednesday, April 4, 2001 at 31. An article about the scandalously low wages paid to attorneys who represent the poor in criminal cases. See, also, <u>Liotti v. New York State</u>, New York Law Journal, March 26, 2001 at 35, cols. 3, 4, 5 and 6 for a decision by Judge Seybert, granting the motion to dismiss as to the State. July 18, 2000, see Memorandum for The Committee for Modern Courts, New York, New York referring to Mr. Liotti's suit and in support of an increase in rates. The Committee is composed of citizens concerned with the quality and administration of justice in New York State. See Laura Mansneurs, <u>A Brake On The Wheels Of Justice, Shortage Of Lawyers For The Poor Plagues The Courts</u>, The New York Times, January 17, 2001 at B1 and Robin Topping, Law & Order Column, Around The Island, Crime & Courts,

information and belief, the Petitioner was represented by assigned counsel in the State Court proceedings.

18.     This petitioner was not told that he would be a Level One sex offender upon his plea or the consequences of that.  As a former Federal Defender in the Eastern District Legal Services Unit, this Court is acutely aware of the problems caused by ineffective assistance of counsel.

19.     Our system of justice is flawed on many levels but today one of our most vexing problems is our treatment of undocumented immigrants and minorities.  This is a worldwide problem that cannot be solved simply by sending people back to those countries where war, disease, death and famine are prevalent.  Everyone wants a better life for themselves and their families but for many it is a matter of survival.

20.     We treat people differently in criminal justice if they are minorities or poor.  In

---

Attorneys Protest Low Pay For Indigent Cases, Newsday, January 17, 2001 at A31. See also, Robin Topping, Around The Island, Putting A Price Tag On The Right To Counsel, Newsday, August 21, 2002 at A23. See Andrew Harris, Judge Narrows Suit Challenging Impact of Low 18-B Rates, New York Law Journal, September 29, 2004 at 1 and 2. Judge Joanna Seybert sustains Mr. Liotti's denial of substantive due process claim.  See Peter R. Schlam and Harvey M. Stone, Article 18-B, Abstention, Hiring and Discrimination, Pleadings, Eastern District Roundup, an article partially devoted to an analysis of Mr. Liotti's case. The New York Law Journal, October 8, 2004 at 3 & 5; News to Note, Lawsuit Attacking 18B System Survives Motion to Dismiss, The Mouthpiece, November/December, 2004 at 23.  See also, Liotti, Thomas F., Does Gideon Still Make a Difference? New York City Law Review, Edited by the students of The City University of New York School of Law, a Journal of Law in the Service of Human Needs, Volume Two, Summer, 1998, Number Two, pp. 105-137. See Podgor, Ellen S., Reviews In Review, Gideon in New York, The Champion, a publication of the National Association of Criminal Defense Lawyers, June, 1999 at 48.  This is a review of Mr. Liotti's Law Review article by Prof. Podgor of the Georgia State University College of Law and Liotti, Thomas F., After 50 Years What Gideon Means to Local Practitioners, Verdict, vol. 19, no. 3, July, 2013 at 20-27.  (Copies attached as Exhibit "K").

our system our way of dealing with the undocumented or so-called illegal aliens is to build walls or send them back to their war torn, impoverished countries. Yet, this conveyor belt does not solve a problem. In criminal justice we treat the foreign born and the undocumented like this petitioner very differently than our own citizens. Does not this scenario as played out in state court and as joined in here by this federal prosecution, violate that portion of the Fourteenth Amendment of the United States Constitution which provides: ". . . nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

21.    While we go through the motions of due process, it is abundantly clear that poor migrants such as this petitioner are not afforded competent counsel or the equal protection of the laws.

22.    The State Trial Court and Appellate Division rubber stamped this petitioner's plea and sentence because neither of them looked at the macrocosm of criminal justice for what it has become - our society's cathartic placebo. Wrongful re-entry and deportation cases are no more than a flaccid elixir and non-antidote to failed immigration policies worldwide.

23.    The question in this case is whether his pleas and sentences here in New York were entered in violation of *Boykin v. Alabama*, 395 U.S. 238 (1969) and not in conformance with our State standard of *People v. Harris*, 61 N.Y.2d 9, 471 N.Y.S.2d 61 (1983) and secondly, whether the petitioner was not advised of the collateral consequences of his pleas and sentences here in New York.

24.    Prior to November 17, 1990 the United States law would allow someone such as the petitioner to become a permanent resident if he had lived in the United States for seven years.

In 1990 §212(1) of the Nationality Act (INA) prohibited a long standing permanent resident to have a legal status here if convicted of an aggravated felony and having served five (5) years in jail. The petitioner was never apprised of his eligibility to apply for permanent residence or how subsequent enactments such as the Anti-terrorism and Effective Death Penalty Act of April 24, 1996 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 have made re-entry into the United States and permanent legal residence here nearly impossible to achieve. See also, *Rankine v. Reno*, 319 F.3d 93 (2003); *Vartelas v. Holder*, 132 S.Ct. 1479 (2012) and *U.S. v. Gill*, 748 F.3d 491 (2014).

25.     The petitioner has been incarcerated for more than a year and has a severe economic hardship warranting a vacatur of these charges and a dismissal of them. See an Editorial, <u>Locked Away in Immigration Jails,</u> The New York Times, February 24, 2014 at A18 attached as Exhibit "B" to our CPL §440 motion. See also, John Eligor and Damien Cave, <u>Paying Price, 16 Years Later for an Illegal Entry</u>, The New York Times, March 20, 2014 at 17 and 18.

26.     The petitioner is now claiming actual innocense; a violation of his Constitutional rights and a necessity defense in that our failed immigration policies force millions to live and work under the radar in order to survive economically. The petitioner was employed in a restaurant as a laborer.

27.     Since 1995 the CPL has provided that trial judges should advise an immigrant petitioner of the possible deportation consequences of the plea. That was not done here in either of the petitioner's two prior felony cases. On November 19, 2013 the New York Court of Appeals decided *People v. Peque*, 22 N.Y.3d 168, 980 N.Y.S.2d 280 (2013). The five Judge

majority of the Court held that trial judges must caution non-citizen petitioners that they may be deported before allowing them to plead guilty to a felony. Chief Judge Lippman and Judge Rivera held that the remedy of vacating the pleas was appropriate since due process rights were involved. See also, Spiros A. Tsimbinos, New York Court of Appeals Deals with Consequences of Padilla Decisions, NYSBA Criminal law Newsletter, Spring, 2014, vol. 12, no. 2 at 6 and 7.

28.     The petitioner also waived his right to appeal, not "knowingly, voluntarily or intelligently." Thus he did not perfect any appeals.

29.     The failure to adequately advise a petitioner of the fact that a plea of guilty would subject him to removal from the United States is violative of the rule established in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709 (1969); see also, *U.S. v. Udeagu*, 110 F.R.D. 172 (1986) where it was determined that there are certain fundamental rights that every person accused of a crime has and which may only be waived "knowingly, voluntarily and intelligently". See also, *People v. Woodard*, 188 Misc.2d 7 (2002). In *Udeagu*, *supra* represented by this defense counsel, Judge Jack Weinstein found that the petitioner had not been apprised of his post-release guidelines and vacated the plea.

30.     Mr. Granados was denied many constitutional rights during these proceedings. The most important is effective assistance of competent counsel. Every defendant who faces criminal charges is entitled to effective assistance of competent counsel. See, *McMann v. Richardson*, 397 U.S. 759, 771 (1970), see also, *Reece v. Georgia*, 350 U.S. 85, 90 (1955), *Powell v. Alabama*, 287 U.S. 45 (1932). *McMann* defines effective assistance of counsel to be that which falls within the range of competence demanded of attorneys in criminal cases. However, the *McMann* standard is only one-half of the evaluation of the claim of effective

11

assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984) the Court developed a

two prong standard for assessing the petitioner's claim of ineffective assistance of counsel.  The

first prong applied the *McMann* test, requiring the petitioner to prove that "counsel's

representation fell below the objective standard of reasonableness." *Id.* at 688.  The second

prong requires that the defendant show "there is a reasonable probability that but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Under Article I, Section 6 of the New York Constitution, the State of New York has developed a

slightly different test for ineffective assistance of counsel from that employed by the Supreme

Court in *Strickland v. Washington.*  See, *People v. Claudio*, 629 N.E.2d 384, 386 ("nonetheless,

the basic purposes and constitutional interests at stake under both constitutional guarantees of an

adequate legal defense in a criminal case are the same: (1) the preservation of our unique

adversarial system of criminal justice, the underlying supposition of which 'is that partisan

activity on both sides of the case will best promote the ultimate objective that the guilty be

convicted and the innocent go free' *United States v. Chronic*, 466 U.S. 648, 655, 104 S.Ct. 2039,

2045, L.Ed.2d 657 quoting from *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555,

45 L.Ed.2d 593 and (2) the corrective necessity to provide a defendant with an advocate

sufficiently competent to ensure the fairness of the adversarial criminal process. *United States v.*

*Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.ed.2d 564.") See also, *Jenkins v. Coombe*,

821 F.2d 158 (1987) where nominal representation was sufficient to set aside a conviction and

*Lopez v. Scully*, 58 F.3d 38 (2d Cir.1995) where defense counsel ceased to advocate and the

conviction was overturned.  This defense represented *Jenkins* and *Lopez, supra.*  See also, *People*

*v. Julio Morales*, No. 98N042944, Manhattan Criminal Court, Judge Louis Nock presiding,

wherein the Court in citing *People v. Ford*, 86 N.Y.2d 397, 405 (1995) vacated an 18 year old drug conviction due to ineffectiveness in not properly advising a defendant on the immigration consequences of his plea. N.Y.L.J., March 25, 2016 at 4.

31.     Ineffective assistance of counsel may "render a guilty plea involuntary, and hence invalid." *Ventura v. Meachum*, 957 F.2d. 1048, 1058 (2d. Cir. 1992).  See, *United States v. George*, 869 F.2d. 333, 335-336 (7th Cir. 1989) (An "accused who has not received reasonably effective assistance from counsel in deciding to plead guilty cannot be bound by that plea because a plea of guilty is valid only if made intelligently and voluntarily.); *see also Downs-Morgan v. United States*, 765. F.2d. 1534 (11th Cir. 1985).  Where a defendant is represented by counsel during the plea process and enters a plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Hill v. Lockhart,* 474 U.S. 52 (1985).  Mr. Jose DeJesus Granados did not have the benefit of effective assistance of counsel during his plea and sentencing.  His legal representation was definitely not "within the range of competence demanded of attorneys in criminal cases" and granted to all people by the Sixth Amendment. See, *McMann* at 771.  It also did not meet the initial prong of the *Baldi* test for effective assistance of counsel. See *People v. Baldi*, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981).

32.     It is antithetical that if a lawyer violates his ethical duty to his client that he has provided effective assistance of counsel in his cause.  The initial prong of the *Baldi* test for effective assistance of counsel requires that counsel advocate in a partisan manner on behalf of Mr. Granados.  This did not happen.  While representing Mr. Granados his former attorneys never advised him about the collateral consequences of deportation.  As a result of this failure

they failed to meet the initial prong of the *Baldi* case.

33.     Mr. Granados's former counselor also did not meet the second *Baldi* prong of effective assistance of counsel during his plea negotiations because his counsel did not provide him with sufficiently competent representation to ensure fairness. See *People v. Baldi*, 54 N.Y.2d 137, 146, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981). Mr. Granados's counsel was clearly not sufficiently competent to provide him with <u>fairness</u> in the adversarial criminal process nor did he even attempt to advocate zealously. He effectively forced Mr. Granados to take the pleas in order to dispose of the case expeditiously. This conduct violates multiple disciplinary rules and ethical codes of conduct. *See* DR 1-102 and 5-105(B).

34.     It is very clear from the plea minutes attached to the petitioner's motion herein that the petitioner did not "knowingly, voluntarily and intelligently" admit to a prior felony conviction since minutes of it were not available, defense counsel failed to do a proper investigation and the Court did not make a proper inquiry.

35.     Mr. Granados's pleas should be rendered involuntary because they did not meet the standard set forth in *Bradshaw v. Stumpf*, 545 U.S. 175 (2005) (a valid guilty plea requires that the petitioner have a complete understanding of the charges against him or her). A guilty plea will be sustained in the absence of any factual recitation of the underlying circumstances of the crime if the pleading defendant is represented by *able* and active counsel, and there is no suggestion in the record that the plea was improvident or baseless. *People v. Nixon*, 21 NY2d. 338, 350 (NY 1967); *People v. Doceti*, 175 A.D.2d. 256 (2d. Dept. 1991); *cf. People v. Seeber*, 4 NY3d. 780 (NY 2005) (an explicit admission of guilt as to every element of the crime does not have to be incorporated into the allocution of every valid plea). However, Mr. Granados did not

14

have able or effective counsel because his counsel did not fully inform him of the affect of his guilty pleas, specifically that he would be subject to deportation. (See Granados affidavit annexed hereto as part of the accompanying exhibits submitted in the State Court proceedings).

36.     The guilty plea tendered by the petitioner was not knowingly, voluntarily and intelligently made in that his attorney did not apprise him of the probability that he could be deported. This constitutes ineffective assistance of counsel, *per se*.

37.     Ultimately, what we are faced with in this situation is a non-lawyer, with a limited understanding of the law in general and an even more limited understanding of New York and immigration law, who, on the advice of counsel, simply pled guilty with absolutely no comprehension of the consequences of that plea, because his attorney did not advise him of same. The petitioner's guilty plea is violative of the rule established in *Strickland*, *Boykin* and *Padilla* and should be given back. The petitioner has less than an American high school education from El Salvador with no understanding of our culture, language or system of justice. See also, Lucia Tobon affidavit attached hereto as part of the exhibits in the State Court proceedings.

38.     On March 31, 2010 the Supreme Court handed down a 7-2 decision in *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). One of the cases relied upon in the instant CPL §440 motion, because Mr. Granados's former attorneys failed to completely advise their client about the effect a conviction for statutory rape with a level one sexual offender registration and ten (10) years probation would have on his ability to remain in this Country.

39.     In *Padilla*, the Court held that a defense lawyer failed to provide his non-citizen client effective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) when he did not warn him that he was almost certain to be deported if he pled guilty. It was the

15

first time the Court applied the *Strickland* standard to a lawyer's failure to advise a client about a consequence of conviction that is not part of the sentence imposed by the Court.

40.     Defense counsel's lack of advisement with respect to deportation falls squarely under the *Strickland* ineffective assistance of counsel standard.  A review of Mr. Granados's plea minutes makes clear that he was never advised, on the record, about <u>any</u> collateral consequences resulting from a guilty plea.  As a result, Mr. Granados's removal status falls squarely under the decision in *Padilla*.

41.     Had Mr. Granados been properly advised rather than simply being rushed to the slaughter, he certainly would have sought out other options including going to trial.  As it stands, he is facing more jail and facing removal from the United States.

42.     The People have historically also misread or misunderstood the holdings in *Strickland v. Washington*, 466 U.S. 668 (1984) and its state equivalent, *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893 (1981) in light of *Jenkins v. Coombe*, 821 F. 2d 158 (1987) and *Padilla v. Kentucky*, 130 S.Ct.1473 (2010).  *Jenkins* provides that merely nominal representation may be ineffective so that the two prong *Strickland, supra* test of a departure from customary practice or standards within the community that made a difference in the outcome has been supplemented by *Jenkins* and what is considered to now be the *per se* rule on collateral consequences.

43.     *Jenkins* and *Padilla* also change the hereto ruling of the New York Court of Appeals in *People v. Harris*, 61 N.Y.2d 9, 471 N.Y.S.2d 61, 459 N.E.2d 170 (1983) which had held that there is "no catechism of rights of which a defendant must be afforded" at the time of his plea.  Now the catechism exists.

16

44.     Furthermore, it does not appear that a Spanish interpreter was properly sworn or even certified at Mr. Granados's plea and sentencing hearings.

45.     At the time of his plea on November 12, 2009 the petitioner was prosecuted by an SCI not a grand jury indictment.  The petitioner had no prior criminal record.  He was not properly advised of his right to have the case presented to a grand jury where he could testify in his own behalf.  See CPL §190.50.  He was not informed of the role of the grand jury or that he could testify before it.

46.     The petitioner was not informed of the fact that the complainant was the only witness against him and that there was no rape kit evidence or DNA to corroborate the so-called victim's version of the event.  See, Kobilinksy, Sweat and Liotti, DNA: Forensic and Legal Applications, published by John Wiley & Sons, Inc., Hoboken, New Jersey (2004).

47.     Defense counsel did not advise his client of his right to go to trial or of his right to cross-examine the complainant.  See, Liotti, Thomas F., Zeh, Christopher W. and Lapidus, Dr. Leah Blumberg, Cross-Examining Children in Sexual Abuse Cases, The Attorney of Nassau County, July, 2000 at 5, 12, 13 and 18; Liotti, Thomas F., The Cross Examination of Child Witnesses, Verdict, a Journal published by the National Coalition of Concerned Legal Professionals, Vol. 6, No. 4, October, 2000 at 11-21; Liotti, Thomas F., The Cross-Examination of Experts in Civil and Criminal Cases, The Attorney of Nassau County, September, 2005 at 3, 10 and 13 and Liotti, Thomas F. and Skelos, Peter B., Credibility Questions for Prosecution Experts On Syndromes in Cases of Rape, Child Abuse, Outside Counsel, New York Law Journal, April 20, 1989 at 1, 2 and 7.

48.     There is no record of a supporting deposition or even of what the People were

17

prepared to prove. There is no medical evidence indicated. Clearly the petitioner's best defense of which he was not advised, was to deny the charges and subject the fifteen year old victim to direct and cross-examination.

49.     The petitioner pled guilty to two E felonies and gained literally nothing by pleading guilty. Any competent defense counsel would have advised him to go to trial.

50.     By pleading guilty to these charges, the petitioner was subjected to jail (time served), probation; Level One Sex Offender registration requirements and mandatory deportation. His attorney at the time consented to the Level One designation without a hearing. This ineffective assistance of counsel is remarkable but made even more so because the petitioner showed literally no understanding of the plea and its collateral consequences.

51.     The Court's perfunctory inquiry of the petitioner and his allocution merely consisted of "yes" and "no" responses which did not verify that the petitioner understood the nature and consequences of the plea or that he was entering it "knowingly, voluntarily and intelligently" especially since his attorney stood next to him and told him what to say. The petitioner said literally nothing in his own words.

52.     On the issue of deportation the Court inquired:

> The Court:     Do you understand that by pleading guilty today in
> this case, your plea may result in deportation or
> denial of naturalization?
>
> Defendant:     Yes.

Record of November 12, 2009 at 5, lines 15-18.

53.     The Court and defense counsel may not have been aware of it at the time but aside from the dire economic conditions in El Salvador to which the petitioner would be returned, the

18

country is in a perpetual state of civil war. It is also engulfed by the highest crime rate in Central America including murder and gangs who threatened this petitioner with death if he did not pay them.

54.     The petitioner was not aware of the statutory rape laws in this country and the complaining witness stalked him and repeatedly attempted to seduce him and showed him pictures of numerous naked men with whom she claimed to have had sexual relations.

55.     Defense counsel did not file a §190.50 notice or retain an investigator. Defense counsel did not visit the scene or speak to any witnesses or even the police concerning his client. He did not investigate whether there was any evidence of the alleged victim fabricating or of her motives to lie.

56.     Neither the Court nor defense counsel demonstrated an understanding of deportation or that immigration counsel had even been consulted.

57.     Not giving *Padilla, supra* retroactive effect is a hypocrisy within our system of justice. It is a sin which basically says that the petitioner should be penalized for the rest of his life even though his lawyer and Judge were in error. It says that going forward that Courts and defense lawyers must give that advisement or pleas will be vitiated. However, this dismal holding and its progeny relative to retroactive effect ignores the fact that Courts and defense counsel have been required in New York, as a matter of law, to give petitioners that advisement since 1995. In this case, the Petitioner was not advised of the collateral consequences of his plea but received almost no legal advice at all. While the minutes of the Petitioner's plea indicate that there was a Spanish interpreter present at that time, the sentencing proceedings indicate that a Spanish interpreter was not present at sentencing thus making the proceeding defective on its

19

face *per se*.

58.     The People's papers in opposition in the aforementioned state court proceedings are extremely disturbing in several respects but most importantly because they reflect not merely a lack of empathy for Mr. Granados as a new immigrant but a gross misunderstanding of the plight of new immigrants in the criminal justice system. In this instance that misunderstanding is so glaring that it clearly shows a blind adherence to uphold a conviction at all costs although the duty of the prosecutor is to do justice. This same blindness is also reflective of inexperience but then must lead to the conclusion that the People are deliberately discriminating against this petitioner in violation of his civil and Constitutional rights.

59.     For example, the People allege that the petitioner is barred from making these claims because he did not appeal. The People, of course, fail to mention that the petitioner was compelled to waive his right to appeal as a condition of his plea. (See p. 5 of the plea minutes, lines 4-12). The petitioner's lawyer at the time was assigned to represent the petitioner in his appeal but did nothing to advise the petitioner of his right to appeal and did nothing to perfect that appeal. There is nothing in the record or outside of it to show that the petitioner had any understanding of his waiver; his rights to appeal or that he had free counsel assigned to him for that purpose. There is nothing to show that defense counsel filed a Notice of Appeal or did anything in writing or on the record to advise the petitioner of his rights in that regard. The failure of defense counsel to properly advise the petitioner of his rights or to take any action to protect those rights was further complicated by the fact that defense counsel did not represent the petitioner in immigration proceedings and the petitioner did not receive a state jail sentence other than time served. He was taken into the custody of immigration authorities and defense counsel,

upon information and belief, made no attempt to contact the petitioner concerning his rights with respect to an appeal, *habeas corpus*, immigration and deportation.

60.     These factors and others show that defense counsel had a conflict of interest in that he was ineffective and ceased to advocate for his client.  The People in State Court misstated the rigors of *Strickland v. Washington*, 466 U.S. 668 (1984) and *People v. Baldi*, 54 N.Y.2d 137 (1981) in that the Second Circuit has held that merely nominal legal representation is ineffective. See, *Jenkins v. Coombe*, 821 F. 2d 158 (1987) and that a defense lawyer who ceases to advocate for a client is ineffective.  See *Lopez v. Scully*, 58 F.3d 38 (2d Cir.1995).

61.     It is also appalling that the People, particularly when faced with the affidavit of Leyda Cruz attached to this petitioner's motion papers, failed to disclose the *Brady* material reflected therein (see ¶5 of the Cruz affidavit).  The People in this County are in the habit of not disclosing *Brady* material.  See *People v. Daly*, 20 A.D.2d 542, 799 N.Y.S.2d 537 (2nd Dept. 2005); 5 N.Y.3d 882 (2005); 57 A.D.3d 914 (2d Dept., 2008); Liotti, Thomas F., The Uneven Playing Field, Part III, Or What's On The Discovery Channel, St. John's Law Review, Vol. 77, No. 1, Winter 2003, pp. 67-74 and Liotti, Thomas F. and Zeh, Christopher, Uneven Playing Field: Ethical Disparities Between The Prosecution And Defense Functions In Criminal Cases, Touro Law Review, Vol. 17, No. 2, Winter 2001 at pp. 467-501.

62.     No doubt the most troubling example of the People's failure to comply with *Brady* is in regard to the allegation in the Cruz affidavit that the alleged underage victim was examined by a Medical Doctor after the purported statutory rape and found to be still a virgin. The People did not even address this issue in their responding papers in the aforementioned State Court proceedings.

63.     The legal point here is, not that the ineffective assistance claim is based upon a myopic reading of *Padilla v. Kentucky*, 130 S.Ct.1473 (2010) alone because the claims are not limited to improperly advising the petitioner with respect to deportation although it is a significant part in the microcosm of the plea and sentence.  However, in the macrocosm of failed immigration policies and a failure to provide effective legal representation to immigrants in criminal cases neither our New York Court of Appeals nor the Supreme Court of the United States except for piecemeal decisions such as *Padilla*, have addressed the global legal issues of ineffective assistance of counsel under *Gideon v. Wainright*, 372 U.S. 335 (1963) and the Sixth Amendment of the United States Constitution.  What more must we do to insure that the rights of these defendants are fully protected?  The rendition of so-called *Boykin* rights by themselves are not enough to insure an understanding of the legal process for people who come before our courts with limited or no English language skills.  Interpreters merely repeat what Judges have to say. Yet there is a void or a gap that exists under existing law because the answers to perfunctory questions posed by the court, often parroted by defendants from the sotto voce of defense counsel, do not in any way show an understanding of their rights or that a waiver of them is occurring "knowingly, voluntarily and intelligently".  The cultural and educational gap is huge. A defendant from a foreign country, here perhaps illegally, wants to avoid trouble, seeing himself as a cog in the system and his only way out being to be compliant and subservient just as the slaves of yesteryear had to be obedient of their masters.  Just as slavery was wrong so too our system of criminal justice in many ways has allowed that bygone era to continue albeit in a different form which belies the true realities of a pluralistic society.

64.     In the recent case of *U.S. v. Phillips*, 13-cr-631, former Chief Judge of the

22

venerated Eastern District of New York, Raymond Dearie, declined to deport a Jamaican immigrant who had previously pled guilty to two armed robberies, served nine years in prison and illegally re-entered the United States. See Ben Bedell, Testimony From Immigrant's Family, Supporters Changes Judge's Mind On Illegal Entry Case, New York Law Journal, August 11, 2015 at 1 and 6.

65.    Similarly, in a recent Manhattan Criminal Court case, Judge Louis Nock granted an evidentiary hearing to Julio Morales who filed a CPL §440 motion in order to fight a deportation order following an 18 year old, misdemeanor drug conviction. See Ben Bedell, Man Fighting Deportation Wins Evidentiary Hearing, N.Y.L.J., September 8, 2015 and *People v. Morales*, Docket No. 98NO42944. (Copy of article attached as Exhibit "L")

66.    In the case of this appellant, much like Mr. Morales, he has argued ineffective assistance, actual innocence and a significant *Brady* omission by the People. See, *Brady v. Maryland*, 373 U.S. 83 (1963). This appellant is entitled to the equal protection of the laws and due process of law which he has yet to receive. See the XIV Amendment of the United States Constitution. See also, Alec Kara Katsanis, President Obama's Department of Justice, The New York Times Op-Ed, August 18, 2015 at A23.

67.    Insofar as the appellant pled guilty to statutory rape, his conviction may be subject to additional scrutiny as a crime of "moral turpitude". See Michael D. Patrick, Immigration Law, Defining Crimes Involving Moral Turpitude, The New York Law Journal, September 17, 2015 at 1 and 9. Clearly, this appellant was not advised either on or off the record of the potential legal implications for pleading guilty to a crime of statutory rape. This too rendered his plea defective due to ineffective assistance of counsel and other deficiencies as contained in the plea allocution

23

and advisements by the Trial Court at the time of the plea.

68. No other application for the same or similar relief has been made or granted.

69. If this application is denied, the Petitioner respectfully prays that the Court will grant him a Certificate of Appealability and a stay of the instant criminal law prosecution.

WHEREFORE, the Petitioner prays that he be granted a writ of *habeas corpus* and if this Petition is not granted that the Court stay the proceedings before it; grant a Certificate of Appealability of this Court's proceedings pending the exhaustion of the petitioner's appellate remedies in the Second Circuit and beyond that to the Supreme Court of the United States, if necessary.

DATED:   Garden City, New York
         May 2, 2016

                          s/ Thomas F. Liotti

                          _____
                          THOMAS F. LIOTTI, ESQ.
                          LAW OFFICES OF THOMAS F. LIOTTI
                          Attorney for Petitioner
                          600 Old Country Road, Suite 530
                          Garden City, New York 11530
                          (516) 794-4700

24