**EXHIBIT G**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT

-----------------------------------------------------------X

PEOPLE OF THE STATE OF NEW YORK,

                 Respondent,

    -against-

JOSE DEJESUS GRANADOS,

              Defendant-Appellant.

-----------------------------------------------------------X

**REPLY AFFIRMATION**

A.D. No. 2015-08389

THOMAS F. LIOTTI, an attorney duly admitted to practice law before the Courts of the State of New York hereby affirms the following to be true under the penalties of perjury:

    1.     I am the attorney for the defendant herein and as such I am fully familiar with the facts and circumstances of this case.

    2.     This reply affirmation is submitted in response to the District Attorney's opposition and in further support of defendant's application for leave to appeal from the denial of a CPL §440 motion decided by the Honorable Angelo A. Delligatti, Nassau County Supreme Court Justice on August 17, 2015.

    3.     On or about August 26, 2015 the defendant-appellant filed a motion with this Court pursuant to CPL §§450.15 and 460.15 for leave to appeal from a denial of a motion in the Trial Court that was made pursuant to CPL §440.10 and 440.20.  The People have responded by an Affirmation in Opposition dated September 18, 2015 and received by defense counsel on

September 21, 2015. The motion is returnable on September 25, 2015 in this Court.

4.      It is apparent that the People's Affirmation in Opposition ignores significant changes in the law as well as the worldwide migration and immigration issues now engulfing the countries of Europe, Africa and the United States. People throughout the world are becoming refugees or migrants in order to escape war, disease, political oppression, famine, extreme poverty, anarchy and death. Countries throughout the world are compelled to open their borders to the refugees and migrants who risk their lives in coming here or to other countries of the world. This defendant-appellant is indeed one of those who sought to escape from the murderous gangs in El Salvador, the same gangs that took the lives of his family members and threatened his own. As in the case of many others, he came to this country with no English skills, a limited education and no knowledge of our culture or judicial system. He came here to escape certain death in his native country and for a better life. Yet like so many others he was soon exploited and became a victim of our deeply flawed criminal justice system. A recent Constitution Day program in this counsel's Village of Westbury helped to explain some of the dynamics associated with contemporary migration problems, not addressed by the People's response or for that matter, the Congress of the United States. (A copy of the program is attached as Exhibit "A")

5.      The issues presented in this appeal are particularly poignant in that the appellant is also concurrently faced with a deportation case in federal court where his defense there is dependent upon the result here or if not successful here, then his only recourse may be in a belatedly filed Petition for *Habeas Corpus* in that Court and failing that, to seek a stay in the Circuit Court and appellate relief there. All the while, this defendant remains incarcerated, the victim of our flawed immigration policies and criminal justice system, wholly ignorant of the

legal machinations that detain him.

6.     In the recent case of *U.S. v. Phillips*, 13-cr-631, former Chief Judge of the venerated Eastern District of New York, Raymond Dearie, declined to deport a Jamaican immigrant who had previously pled guilty to two armed robberies, served nine years in prison and illegally re-entered the United States.  See Ben Bedell, <u>Testimony From Immigrant's Family, Supporters Changes Judge's Mind On Illegal Entry Case</u>, New York Law Journal, August 11, 2015 at 1 and 6.  (Copy of article attached as Exhibit "B")

7.     Similarly, in a recent Manhattan Criminal Court case, Judge Louis Nock granted an evidentiary hearing to Julio Morales who filed a CPL §440 motion in order to fight a deportation order following a 15 year old, misdemeanor drug conviction.  See Ben Bedell, <u>Man Fighting Deportation Wins Evidentiary Hearing</u>, N.Y.L.J., September 8, 2015 and *People v. Morales*, Docket No. 98NO42944.  (Copy of article attached as Exhibit "C")

8.     In the case of this appellant, much like Mr. Morales, he has argued ineffective assistance, actual innocense and a significant *Brady* omission by the People.  See, *Brady v. Maryland*, 373 U.S. 83 (1963).  This appellant is entitled to the equal protection of the laws and due process of law which he has yet to receive.  See the XIV Amendment of the United States Constitution.  See also, Alec Kara Katsanis, <u>President Obama's Department of Justice</u>, The New York Times Op-Ed, August 18, 2015 at A23.

9.     Insofar as the appellant pled guilty to statutory rape, his conviction may be subject to additional scrutiny as a crime of "moral turpitude".  See Michael D. Patrick, <u>Immigration Law, Defining Crimes Involving Moral Turpitude</u>, The New York Law Journal, September 17, 2015 at 1 and 9.  Clearly, this appellant was not advised either on or off the record of the potential legal

3

implications for pleading guilty to a crime of statutory rape. This too rendered his plea defective due to ineffective assistance of counsel and other deficiencies as contained in the plea allocution and advisements by the Trial Court at the time of the plea.

10.     The Respondent argues against the retroactivity of *Padilla* and its progeny presumably because it would otherwise open up the floodgates of litigation by those claiming ineffective assistance of counsel at the time of their pleas, trials, convictions and sentences. See, *Padilla v. Kentucky*, 130 S.Ct.1473 (2010). But query, isn't this what our Constitution is for? Isn't it a guard against "mass incarceration" and other denials of civil and human rights? Such a legal argument by the respondent defeats the admonition of our former Chief Judge during a State of the Judiciary Address where she noted that it is our collective job "not to just count cases, but to make every case count."

11.     Immigration policies are being hotly debated. While Congress languishes, it is for the judiciary to find solutions by complying with the Constitution whether it opens the floodgates or not. If we erred in the past with respect to this appellant and others like him, then as an enlightened nation we must address those issues and not simply sweep them under the rug. A denial of fundamental rights cannot be ignored by wrongful adherence to *stare decisis* in the face of immigration policies and mores with respect to them, that change minute by minute. We cannot close our borders any more than we can close our minds to the need for change with respect to woefully deficient, non-existent or uniform and consistent immigration and deportation policies or for that matter, pleas that are impacted by policies that are failing both in the United States and abroad. It is an obligation as a nation to do justice one case at a time.

WHEREFORE, the appellant respectfully prays that this Court grant his application for leave to appeal before it and for such other and further relief as this Court may deem just and proper.

DATED:     Garden City, New York
           September 23, 2015

                                    _____
                                    THOMAS F. LIOTTI

5

**EXHIBIT A**

# Constitution Day

## September 17, 2015



**IMAGINE -JOHN LENNON**

Imagine there's no heaven
It's easy if you try
No hell below us
Above us only sky
Imagine all the people
Living for today...
Imagine there's no countries
It isn't hard to do
Nothing to kill or die for
And no religion too
Imagine all the people
Living life in peace...
You may say I'm a dreamer
But I'm not the only one
I hope someday you'll join us
And the world will be as one
Imagine no possessions
I wonder if you can
No need for greed or hunger
A brotherhood of man
Imagine all the people
Sharing all the world...
You may say I'm a dreamer
But I'm not the only one
I hope someday you'll join us
And the world will live as one

*"We have come a long way from the days when fear and prejudice toward alien races were the guiding forces behind our immigration laws. The Chinese exclusion acts of the 1880's and the 'barred zone' created by the 1917 Immigration Act have, thankfully been removed from the statute books and relegated to the historical treatises."*

See <u>Lennon v. Immigration and Naturalization Service</u>, 527 F.2d 187 (1975). From the majority opinion by Chief Judge Irving R. Kaufman.

# The Westbury Times
### Established 1907

*Karl V. Anton, Jr., Publisher, Anton Community Newspapers, 1984-2000*

Publication Office: 132 East Second St., Mineola, NY 11501
Phone: (516) 747-8282 • Fax: (516) 742-5867
www.thewestburytimes.com

© 2015 Long Island Community Newspapers, Inc.

**Editor and Publisher**
Angela Susan Anton
**President**
Frank A. Virga
**Executive Assistant**
Shari Egnasko
**Operatons Manager**
Iris Picone

**Senior Managing Editor**
Sheri ArbitalJacoby
**Managing Editor**
Rich Forestano
**Editor**
Betsy Abraham
**Ad Sales**
Wendy Kates, Pat Salmon

**Director of Production**
Karen L. Mengel
**Art Director**
Alex Nuñez
**Circulation Director**
Joy DiDonato
**Page Designer**
Kevin Schmidt

Email: First initial of first name, followed by last name, @antonmediagroup.com • For circulation inquiries, email: subscribe@antonmediagroup.com

# Constitution Day



WESTBURY
VILLAGE
JUSTICE
**THOMAS F. LIOTTI**

In 2004 the late United States Senator from West Virginia, Robert Byrd, convinced the Congress to pass a law that requires all colleges and universities receiving federal aid to have an annual program on the Constitution. Sept. 17, the day when the Constitution was enacted in 1787 has since been referred to as Constitution Day. For the past six years our Village Justice Court invites distinguished speakers to address different aspects of the Constitution on that day, Sept. 17.

Up until now our focus has been on the Bill of Rights or the first 10 amendments of the Constitution adopted in 1791. Our programs have included the First Amendment's speech, association and religion provisions; the Second Amendment's right to bear arms and the Fourth Amendment's search and seizure mandates.

In 2015 we intend to branch out by joining in the national debate regarding the 14th Amendment and immigration. The 14th Amendment was adopted in 1868. It provides that all persons born or naturalized in the United States are citizens of the United States with all the privileges or immunities attendant thereto. This language would seemingly protect so-called "anchor babies" against deportation even if they are the offspring of undocumented or illegal immigrants. This will be part of our program to which you are invited— Sept. 17 at 7 p.m. at Village Justice Court where we will address the impact of immigration, both legal and illegal, in our schools and village.

Ultimately we are hopeful that our program may provide solutions to a vexing problem that thus far has escaped concrete resolution except for the dogmatic, pandering rhetoric of some. Let's learn more together about the issues and find solutions to them. I look forward to seeing you on Sept. 17 at 7 p.m. at Village Hall, 235 Lincoln Place, in Westbury.

## <u>Constitution Day – September 17th, 2015</u>

## <u>Acknowledgments</u>

The Village Justice Court takes this opportunity to formerly thank Lawrence Boes, Esq. a retired partner of the law firm of Fulbright and Jaworski, Esqs.; Rita Geraldi, our Village Justice Court Clerk; Rosemary Ellerby, Justice Liotti's Office Manager in his law firm, Law Offices of Thomas F. Liotti, L.L.C. and Mayor Peter I. Cavallaro, Esq. for their support in the organizing of this program.

REVISED
PROGRAM:

# The Constitution and Immigration

Seventh Annual <u>Constitution Day</u>, celebrated by the Incorporated Village of Westbury Justice Court, September 17, 2015 at 7:00 p.m., 235 Lincoln Place, Westbury, New York.

## <u>Presentation by the Westbury High School ROTC Program.</u><br><u>Color Guard; National Anthem and Pledge of Allegiance.</u>

### <u>Speakers:</u>

**The Honorable Thomas F. Liotti**, Welcome and Introductions.                    5 minutes

**The Honorable Ayesha Keri Brantley**, Village Justice for the Incorporated Village of Hempstead.
<u>Topic: The Constitution.</u>                                                                15 minutes

**The Honorable Elizabeth Pessala**, Associate Village Justice,
<u>Defining The Problems of International Migration.</u>                    5 minutes

**Professor M. Pat Young, Esq.**, Program Director, the Central American Refugee Center, Hempstead, New York
<u>Topic: The 14th Amendment and Immigration.</u>                              15 minutes

**Michael Leavitt, Esq.**, a partner at Cohen & Leavitt, Esqs., New York, New York.
<u>Topic: Conflicting Constitutional Authority Over Immigration: The Congress vs. The President.</u>                                                15 minutes

**Zan Khan, Esq.**, an Associate Attorney at the law firm of Madeo & Fasano, New York, New York.
<u>Topic: Immigration From a Personal Perspective: Discrimination Practiced Against Other Racial and Ethnic Groups.</u>                              10 minutes

**Mr. Floyd Ewing**, Past President of the Westbury Board of Education.
<u>Topic: Immigration and Its Impact On Public Education.</u>                  10 minutes

**Arthur Dobrin, D.S.W.**, Former Leader of the Ethical Humanist Society of Long Island and Professor at Hofstra University.
<u>Topic: The Constitution and Rhetoric: The Moral and Ethical Implications Of Immigration Policies.</u>                                                10 minutes

PROGRAM:

# The Constitution and Immigration

Seventh Annual <u>Constitution Day</u>, celebrated by the Incorporated Village of Westbury Justice Court, September 17, 2015 at 7:00 p.m., 235 Lincoln Place, Westbury, New York.

## Speakers:

**The Honorable Thomas F. Liotti**, Welcome and Introductions.                5 minutes

**The Honorable Arthur D. Spatt,** Senior United States District Judge, The United States District Court, for the Eastern District of New York. <u>Topic: The Constitution.</u>                15 minutes

**The Honorable Elizabeth Pessala**, Associate Village Justice, <u>Defining The Problems of International Migration.</u>                5 minutes

**Professor M. Pat Young, Esq.,** Program Director, the Central American Refugee Center, Hempstead, New York <u>Topic: The 14th Amendment and Immigration.</u>                15 minutes

**Michael Leavitt, Esq.,** a partner at Cohen & Leavitt, Esqs., New York, New York. <u>Topic: Conflicting Constitutional Authority Over Immigration: The Congress vs. The President.</u>                15 minutes

**Zan Khan, Esq.,** an Associate Attorney at the law firm of Madeo & Fasano, New York, New York. <u>Topic: Immigration From a Personal Perspective: Discrimination Practiced Against Other Racial and Ethnic Groups.</u>                10 minutes

**Mr. Floyd Ewing**, Past President of the Westbury Board of Education. <u>Topic: Immigration and Its Impact On Public Education.</u>                10 minutes

**Arthur Dobrin, D.S.W.,** Former Leader of the Ethical Humanist Society of Long Island and Professor at Hofstra University. <u>Topic: The Constitution and Rhetoric: The Moral and Ethical Implications Of Immigration Policies.</u>                10 minutes

# Appendices

Supreme Court of the United States
Washington, D. C. 20543

CHAMBERS OF
JUSTICE RUTH BADER GINSBURG

August 17, 2015

Justice Thomas F. Liotti
Village of Westbury
Village Justice Court
235 Lincoln Place
Westbury, NY 11590-3295

Dear Justice Liotti:

Much as I would like to accept your invitation to speak at the Constitution Day event you are hosting, my 2015-2016 extracurricular calendar already contains all the out-of-town engagements I can safely manage. Any further undertaking, past experience confirms, would risk time needed for the heavy work here.

With appreciation for your interest in my participation, and every good wish,

Ruth Bader Ginsburg

Ruth Bader Ginsburg

Supreme Court of the United States

Washington, D. C. 20543

CHAMBERS OF
JUSTICE SONIA SOTOMAYOR

August 18, 2015

Justice Thomas F. Liotti
Village of Westbury
Village Justice Court
235 Lincoln Place
Westbury, New York 11590-3295

Dear Justice Liotti:

I am grateful for your invitation to be a speaker at the Constitution Day celebration he on September 17, 2015 at your Village Court in Westbury, New York. Regrettably, I will be traveling elsewhere during that time and therefore will be unable to accept your kind invitatio

Thank you for thinking of me. I hope the event is a success.

With warmest regards,

Sonia Sotomayor

Supreme Court of the United States
Washington, D. C. 20543

CHAMBERS OF
JUSTICE SAMUEL A. ALITO, JR.

August 19, 2015

Mr. Thomas F. Liotti
Village of Westbury
235 Lincoln Place
Westbury, New York 11590-3295

Dear Mr. Liotti:

I apologize for the delay in responding to your letter of August 5th. We only received the letter today, after your deadline of August 15th. I am honored by your invitation to speak at the Constitution Day celebration, but regret that I am unable to attend. The demanding work of the Court does not allow for much travelling and speaking, and I must be strict in limiting the number of invitations I can accept. I do, however, thank you for the invitation and wish you great success with your event.

Sincerely yours,

S. A. A.

SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104

Morris Dees
*Founder and Chief Trial Counsel*

August 13, 2015

Hon. Thomas F. Liotti
Village of Westbury
Village Justice Court
235 Lincoln Place
Westbury, NY 11590-3295

Dear Tom,

Thanks so much for your kind invitation to celebrate Constitution Day on September 17th with you and your community

Unfortunately, I am unable to join you due to a conflicting engagement.

With kindest regards, I remain

Sincerely,

Morris Dees



DIOCESE OF ROCKVILLE CENTRE
OFFICE OF THE BISHOP

August 24, 2015

Mr. Thomas F. Liotti
600 Old Country Road, Suite 530
Garden City, New York 11530

Dear Mr. Liotti:

Thank you very much for your letter of July 26th. I too enjoyed our conversation at ABC and, as I told you, while I have only just begun your book, I have it on my Kindle to be read when I have a little bit of free time.

In your letter you invite me to take part in a Constitution Day that you celebrate in your Village Court. I want to thank you for thinking of me for that September 17th event. While I would like very much to be able to accept that invitation, I find that my own calendar is so filled with other commitments to specific Catholic events, particularly in the months of September and October, that I respectfully must decline.

Please be assured that I look forward to our meeting in the future and that we might also continue our conversation.

With my prayers and best wishes, I am

*All my Best!*

Sincerely yours in Christ,

*[signature]*

Bishop of Rockville Centre

*Randall T. Eng*
*Presiding Justice*

*Appellate Division*
*Supreme Court of the State of New York*
*Second Judicial Department*
*45 Monroe Place*
*Brooklyn, New York 11201*

*(718) 722-6400*

August 17, 2015

Thomas F. Liotti, Village Justice
Village Justice Court
Village of Westbury
235 Lincoln Place
Westbury, N.Y.  11590-3295

Dear Justice Liotti:

Thank you for your invitation to speak at the Constitution Day 2015 celebration on Thursday, September 17, 2015, which will be held at the Village Court in Westbury, New York.

Unfortunately, due to a previous commitment, I will be unable to attend the event. Best wishes for a successful celebration.

Very truly yours,

RANDALL T. ENG
Presiding Justice

RTE/la



# NASSAU COUNTY BAR ASSOCIATION

T: 516.747.4070
F: 516.747.4147

15th & West Streets
Mineola, NY 11501

info@nassaubar.org
www.nassaubar.org

**OFFICERS**
Steven J. Eisman, President
Martha Krisel, President-Elect
Steven G. Leventhal, Vice President
Elena Karabatos, Treasurer
Richard D. Collins, Secretary

**EXECUTIVE DIRECTOR**
Keith J. Soressi, Esq.

**ELECTED DIRECTORS**
Rosalia Baiamonte
Adam D'Antonio
Brian J. Davis
Jaime D. Ezratty
Edmond D. Farrell
Marilyn K. Genoa
Alan B. Hodish
Christie R. Jacobson
James P. Joseph
Sarika Kapoor
Gregory S. Lisi
Michael A. Markowitz
Kevin P. McDonough
Sondra K. Pardes
Elizabeth D. Pessala
Lisa M. Petrocelli
Jennifer Rosenkrantz
Ross L. Schiller
Alan J. Schwartz
Peter B. Skelos
Sanford Strenger
Charlene J. Thompson
Carolyn Reinach Wolf
Kathleen Wright

**ACADEMY OF LAW DEAN**
Mary Ann Aiello

**PAST PRESIDENT DIRECTORS**
John R. Dunne
M. Hallsted Christ
Jon N. Santemma
Harold A. Mahony
Robert W. Corcoran
Michael J. Ostrow
Peter T. Affatato
Edward T. Robinson, III
Stephen Gassman
Frank E. Yannelli
A. Thomas Levin
Andrew J. Simons
Joseph W. Ryan, Jr.
Grace D. Moran
Frank A. Gulotta, Jr.
Arlene Zalayet
Frank Giorgio, Jr.
M. Kathryn Meng
Owen B. Walsh
Kenneth L. Marten
William M. Savino
Susan T. Kluewer
Christopher T. McGrath
Douglas J. Good
Lance D. Clarke
Peter H. Levy
Emily F. Franchina
Marc C. Gann
Susan Katz Richman
Marian C. Rice
Peter J. Mancuso
John P. McEntee

August 21, 2015

**VIA FACSIMILE (516) 334-7563**
Honorable Thomas F. Liotti
Village Justice
Village of Westbury
235 Lincoln Place
Westbury, New York 11590-3295

Dear Honorable Sir:

After only receiving your letter yesterday and due to a prior commitment, it is with regret that I have to decline your invitation to celebrate Constitution Day on September 17th.

Wishing success to the program, I remain,

Very truly yours,

Steven J. Eisman

SERVING OUR MEMBERS, OUR PROFESSION AND OUR COMMUNITY SINCE 1899

**RICHARD G. HANDLER**
ATTORNEYS AT LAW
50 BROADWAY
P.O. BOX 427
AMITYVILLE, NEW YORK 11701

TEL. (631) 598-1400
FAX. (631) 598-0952

RICHARD G. HANDLER
MARY S. CALABRESE
RYAN A. McKEON
EILEEN M. KRETZ-McCARTHY
JOELLEN J. VERITY
PARALEGALS

EMAIL:
FIRST INITIAL & LAST NAME
@ AMITYVILLELAW.NET

August 24, 2015

Village of Westbury Justice Court
235 Lincoln Place
Westbury, New York 11590

Attn: Hon. Thomas F. Liotti

Re: Constitution Day – 2015

Dear Justice Liotti:

I was both startled and honored by your very unexpected invitation to speak at the Court's annual Constitution Day celebration. I would have proudly accepted, however, I have a commitment which cannot be avoided on the same evening before the Planning Board – Village of Lindenhurst. My client is purchasing a large commercial piece, subject to Planning Board approval. The Contract contingency requires that the Hearing take place "no later than the September, 2015 meeting of the Board". Consequently, it would be impossible for me to attend.

Kindly keep my name available for some future program that I might contribute to. My best wishes are extended to you and the other participants for a successful program. Frankly, I am unaware that any other Justice Court celebrates such an auspicious event. I am not surprised that this annual recognition is occurring under your tenure.

Thank you again.

Most sincerely,

Richard G. Handler

RGH:jeg

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

100 Federal Plaza

Central Islip, NY 11722

**ARTHUR D. SPATT**
*Senior United States District Judge*

## PERSONAL AND UNOFFICIAL

September 4, 2015

Hon. Thomas F. Liotti
Village of Westbury
235 Lincoln Place
Westbury, New York  11590-3295

Dear Judge Liotti:

In accordance with my telephone conversation
yesterday with your office, this is to confirm that
regretfully I have  withdrawn my acceptance to
speak at your Constitution Day on September
17th and I will not attend that event.

I hope that it will be a most noteworthy event.

Very truly yours,

*Arthur D. Spatt*

ARTHUR D. SPATT

ADS:vc



STATE OF NEW YORK
**EXECUTIVE CHAMBER**
ALBANY 12224

ANDREW M. CUOMO
GOVERNOR

September 1, 2015

The Honorable Thomas F. Liotti
Village of Westbury
235 Lincoln Place
Westbury, NY 11590

Dear Village Justice Liotti:

Thank you for inviting Governor Cuomo to speak at the celebration event occurring September 17, 2015. He was honored that you thought of him for this important occasion and he appreciated hearing from you.

On behalf of the Governor, I regret to inform you that his schedule will not permit him to attend at this time. The Governor sends his best wishes for a successful event. If you have any questions or concerns, please do not hesitate to contact me at (518) 474-4727.

Thank you again for your thoughtful invitation. I hope you will keep the Governor in mind for future events.

Warmest regards.

Sincerely,

Jill DesRosiers
Director of Scheduling

**WE WORK FOR THE PEOPLE**
PERFORMANCE ★ INTEGRITY ★ PRIDE

♻ printed on recycled paper

NEWSDAY, FRIDAY, AUGUST 28, 2015    newsday.com    OPINION

## OPINION

A31

# Trump is wrong on birth citizenship

**The 'anchor baby' argument can be easily countered by the Constitution**

BY PATRICK YOUNG

It's useless to engage the specifically silly rhetoric by Donald Trump and others that might lead people to believe scores of pregnant Mexican women are waiting at the border to hop the fence and give birth in the United States.

That's because children who are born here cannot apply for their mothers to get legal residency until the citizen child turns 21. Therefore, the threat of "anchor babies" is political fiction, but the constitutional foundation of birthright citizenship is not.

While some politicians claim that birthright citizenship is a "policy" or a "law," I credit Trump, the GOP presidential front-runner, for knowing that it comes from the 14th Amendment. He has said he believes the amendment, which grew out of the Civil War carnage, has been misinterpreted and needs to be altered or challenged in the Supreme Court.

The argument against birthright citizenship is that the 14th Amendment was ratified to overturn the Dred Scott decision denying blacks U.S. citizenship and that it should only apply to those who had been the victims of slavery. However, that is not how the amendment is written and it is not how it has been applied. Over the last two decades, clauses of the amendment have been invoked by the Supreme Court to award George W. Bush the 2000 election, overturn the Defense of Marriage Act, and require the elimination of university affirmative action programs that limit the number of white students. None of these decisions benefited former slaves.

The amendment's citizenship clause is straightforward: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Immigrants here illegally are subject to U.S. jurisdiction while they live here, and therefore their children born here are citizens.



Donald Trump speaks at a rally in Dubuque, Iowa, on Tuesday.

The argument that the framers of the amendment never intended to protect anyone who had not been a slave, and particularly not immigrants, is easily countered by the clause's reference to naturalized citizens. The men who passed this amendment in 1868 lived during the greatest immigrant influx in American history. They were quite aware of the interplay between immigration and citizenship.

The Supreme Court first addressed the issue of who is covered by the citizenship clause at a tumultuous time for immigration. Many Chinese immigrants had recently lost their legal status through the Chinese Exclusion Act of 1892. The court found that with the exception of the children of diplomats, enemy soldiers and Indians living "tribally," all other children born in the United States are citizens.

In its 1898 decision in the Chinese birthright citizenship case of U.S. v. Wong Kim Ark, the court noted that if the citizenship clause were not applied broadly, many people's citizenship would be called into question. We should take that warning to heart. If the 147-year-old interpretation is overturned, then people born in the United States — like me — might have to prove their parents had not come here illegally.

Birth certificates showing an American birthplace would no longer be enough to establish citizenship. We can imagine the scene at hospitals where mothers giving birth would have to carry their passports or green cards into the birthing rooms to make sure their children are recorded as citizens.

The 14th Amendment is one of the noblest expansions of American freedom. Its framers understood the changing face of America in ways their fathers could not have. They saw America's future and they wanted everyone born here to be part of it.



*Patrick Young is legal director of the immigrant advocacy group CARECEN and writes for Long Island Wins.*

THE NEW YORK TIMES FRIDAY, AUGUST 28, 2015

## *Migration Crisis Grows as Bodies Are Discovered in Austria*

### Q AND A.

# Migrant Or Refugee? Difference Is Legal One

**By SOMINI SENGUPTA**

In the first half of this year alone, at least 137,000 men, women and children crossed the Mediterranean Sea to reach the shores of Europe, according to the United Nations. Thousands are traveling across the Balkans now.

**Q. Does it matter what you call them?**
**A.** Yes. The terms "migrant" and "refugee" are sometimes used interchangeably, but there is a crucial legal difference between the two.

**Q. Who is a refugee?**
**A.** Briefly, a refugee is person who has fled his or her country to escape war or persecution, and can prove it.

The 1951 Refugee Convention, negotiated after World War II, defines a refugee as a person who, "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality, and is unable to, or owing to such fear, is unwilling to avail himself of the protection of that country."

Among those crossing the Mediterranean in the first half of 2015, the greatest numbers came from Syria, Afghanistan or Eritrea. Syrians are widely presumed to be refugees because of the civil war there, according to the United Nations refugee agency. Many Afghans have

been able to make the case that they are fleeing conflict, the agency added, and Eritreans can generally argue that they would face political persecution at home in Eritrea, which is ruled by one of the world's most repressive regimes.

**Q. What does the distinction mean for European countries?**
**A.** Refugees are entitled to basic protections under the 1951 convention and other international agreements. Once in Europe, refugees can apply for political asylum or another protected status, sometimes temporary. By law, refugees cannot be sent back to countries where their lives would be in danger. "One of the most fundamental principles laid down in international law is that refugees should not be expelled or returned to situations where their life and freedom would be under threat," the refugee agency said in a statement on Thursday.

**Q. Who is a migrant?**
**A.** Anyone moving from one country to another is considered a migrant unless he or she is specifically fleeing war or persecution. Migrants may be fleeing dire poverty, or may be well-off and merely seeking better opportunities, or may be migrating to join relatives who have gone before them. There is an emerging debate about whether migrants fleeing their homes because of the effects of climate change — the desertification of the Sahel region, for example, or the sinking of coastal islands in Bangladesh — ought to be reclassified as refugees.

**Q. Are migrants treated differently from refugees?**
**A.** Countries are free to deport migrants who arrive without legal papers, which they cannot do with refugees under the 1951 convention.

So it is not surprising that many politicians in Europe prefer to refer to everyone fleeing to the continent as migrants.

**Q. Which term applies to the flood of people reaching Europe now?**
**A.** The United Nations refugee agency says that most of them are refugees, though some are considered migrants. "The majority of people arriving this year in Italy and Greece, especially, have been from countries mired in war or which otherwise are considered to be 'refugee-producing,' and for whom international protection is needed," the refugee agency said. "However, a smaller proportion is from elsewhere, and for many of these individuals, the term 'migrant' would be correct." Human traffickers make no such distinctions, though; refugees and migrants are often jammed into the same rickety boats for the crossing.

**Q. How does the United States see the issue?**
**A.** Admitting refugees is somewhat different in the United States. The State Department vets a select number of people — lately, around 70,000 a year — and admits them as refugees. Others who arrive in the country without legal papers can apply for political asylum; in that case, a judge decides on the merits of their claims.

# Business Day

ON                B1

WEDNESDAY, SEPTEMBER 2, 2015

The New York Times



RICK WILKING/REUTERS

Donald Trump during a news conference outside Laredo, Tex., near the border with Mexico.

# A Shaky Grasp on Immigration

**EDUARDO PORTER**

**ECONOMIC SCENE**

When Donald Trump was reaching adulthood in the mid-1960s, the United States was a less diverse place. By 1970, the share of the population born overseas had shrunk to 4.7 percent, the slimmest on record. Only about 0.4 percent of the population had been born in Mexico.

The core constituency of Mr. Trump, the Republican front-runner — white, older voters like him who are more likely to believe that immigrants take Americans' jobs, housing and health care than accept that they contribute to the economy — came of age largely at that stage in history, from the 1950s through the early 1970s.

"It was a unique period of rapid economic growth, when the children and grandchildren of Europeans were blending into a homogeneous mass," said Douglas S. Massey, a Princeton sociologist. "That world is gone."

This transformation provides the most convincing explanation of the runaway popularity of Mr. Trump's proposition to kick out the estimated 11 million immigrants living illegally in the United States today and close the door to future migrants with a 2,000-mile border wall.

To these voters, a country where 13 percent of the population was born abroad and where 17 per-

*Continued on Page 8*

B8

# Trump's Shaky Grasp of the Immigration Situatio

From First Business Page

cent identify as Latino is a scary place. But what is most paradoxical about that belief is that Mr. Trump's central proposition — that illegal immigration into the United States remains a critical problem — is actually wrong. Mr. Trump, as Mr. Massey succinctly put it, "is beating a dead horse."

Since the housing bubble burst and construction jobs dried up, more unauthorized immigrants have left the United States than have come in. Careful estimates by the Pew Research Center show that the number of undocumented Mexicans living in the United States shrank by roughly 1.1 million by 2012, from its peak in 2007.

Illegal immigration could rebound as the American economy recovers further. But Mr. Massey and others argue that a more powerful force is pulling in the other direction: demographics, which has significantly shrunk the population of Mexicans interested in crossing the border.

"I don't see Mexicans coming back in any great number," said Pia M. Orrenius, an economist at the Federal Reserve Bank of Dallas who has studied patterns of illegal immigration. "The cohorts of working-age men are much diminished, so you don't have the push."

Indeed, 15- to 24-year-olds, those most likely to consider going north, shrank to 18 percent of the Mexican population in 2015 from 22 percent in 1990. They are expected to drop to 16 percent of the population in 2025.

Email: eporter@nytimes.com;
Twitter: @portereduardo

The great migration boom from Mexico from the 1980s through the first half of the last decade was the consequence of "a perfect storm," said Gordon Hanson, an economics professor at the University of California, San Diego.

Even as the United States experienced solid growth through what came to be known as the Great Moderation, Mexico suffered three currency crises in 13 years. And while growth in the American-born labor supply slowed after the last of the baby

## An influx of unauthorized migrants is now receding.

boomers entered the work force, Mexico's working-age population was still expanding fast.

"This period won't be repeated," Professor Hanson said. "The great Mexican migration wave has crested."

Perhaps the strangest thing about Mr. Trump's appeal is that his main weapon — the border wall — is already well established. It has proved, at best, pretty much irrelevant. At worst, it backfired badly.

Border Patrol personnel have doubled since 2004, to more than 21,000. More than 650 miles of fencing has been built, festooned with sensors and backed up by drones.

These days, immigration enforcement takes up half the nation's entire law enforcement

budget. The border patrol's budget alone has increased more than tenfold since 1970, to nearly $4 billion.

Recent research by Professor Hanson, Scott Borger of the Department of Homeland Security and Bryan Roberts of Econometrica, based on data from the Department of Homeland Security, suggests that the most recent step-up of border enforcement may have had a bigger effect than previous efforts, accounting for one-third of the downturn in illegal immigration from 2003 to 2010.

Yet the expansive border buildup has also had perverse effects, promoting the very pattern it was supposedly intended to curb.

"Enforcement increases the cost of crossing the border but also increases the payoff, because it raises the wage of those who get through," because there are fewer of them, Ms. Orrenius noted. "So you can return to the market equilibrium that you had."

Soon-to-be-published research by Professor Massey, Karen A. Pren of Princeton and Jorge Durand of the University of Guadalajara in Mexico, based on tens of thousands of interviews with migrants from nearly 150 Mexican communities, concluded that the odds of a prospective immigrant ultimately making it illegally into the United States remained above 95 percent until 2008.

The probability declined to 75 percent after 2008, but by then economic and demographic forces had pushed net illegal immigration down to about zero.

The border buildup did change immigration patterns, Professor

B8

# Trump's Shaky Grasp of the Immigration Situation

Massey argued, but mostly in undesired ways. It didn't stop immigrants from making it in. But the rising cost of entry to the United States — the higher smugglers' fees, the greater odds of dying on the way — ensured that those who made it stayed in the United States.

What was once a pendular flow of Mexican men coming north to do seasonal work in a handful of states and returning to Mexico in the winter became a permanent community of full-fledged families that settled across the 48 contiguous states.

Mr. Trump could blame the browning of America at least in part on the wall. In a cheeky bit of counterfactual analysis, the three researchers estimated that the tightening of border enforcement since 1986 actually added four million people to the population of immigrants living illegally in the United States in 2010.

Nostalgia, of course, has no place for analysis. Analytical quibbles are unlikely to sway Mr. Trump or his followers.

They might even take comfort from examples in history of nearly impregnable walls. East Germany managed to close itself off from the West from 1961 to 1989 with an effectiveness of 95 percent.

It was expensive, though. It took nearly 30,000 guards to defend a boundary less than half the length of the Mexico-United States border. Border guards used land mines and shot to kill. They got help from the Stasi, monitoring every aspect of East Germans' lives.

This seems like a high price to pay to stop a trickle of illegal immigrants that is falling on its own to zero.

## A Cresting Wave of Migration

After rising rapidly, the number of illegal immigrants from Mexico living in the United States has fallen in recent years. Migration from other countries has continued to climb, but at a modest pace.

**Estimated number of illegal immigrants in the United States, by country or region of origin**



Asia includes South and East Asia. Southwest Asia and all Central Asian republics of the former Soviet Union are included with "Rest of the world."

Source: Pew Research Center

THW NEW YORK TIMES

**EXHIBIT B**

# Testimony From Immigrant's Family, Supporters Changes Judge's Mind on Illegal Entry Charge

**BY BEN BEDELL**

A FEDERAL judge, who said he was initially skeptical about a Jamaica-born felon's "predictable and unimpressive" appeal to avoid deportation, has reconsidered his position and dismissed an indictment against the man for illegally reentering the United States.

After hearing testimony about Shanado Phillips' life, Eastern District Judge Raymond Dearie concluded that "unusual and outstanding equities weighing in his favor" required dismissal of the indictment.

"To my surprise, Phillips's hearing presentation was from the outset credible, convincing, and in all respects impressive," Dearie said in U.S. v. Phillips, 13-cr-631. "His testimony was itself revealing and insightful, displaying maturity, decency and obvious candor."

In 1996, Phillips pleaded guilty to two armed robberies and served nine years in prison, after which


Shanado Phillips in 2013

he was deported to Jamaica. He reentered the U.S. illegally in 2006 and was arrested in 2013.

"Balancing his serious but short-lived criminal history with his many years of productive and otherwise law-abiding residency in the United States, his steady work history and, most importantly, his strong family ties and lack of family in Jamaica," Dearie concluded,

"Phillips has in his own way broken with his prior life."

Phillips, 41, was brought by his family to Brooklyn when he was 10 and has spent all but two years of his life in the United States, Dearie noted, adding that Phillips's "brief but not insignificant criminal history began and ended when he was 21."

Dearie said the first robbery was a misguided attempt to assist Phillips' brother in intimidating a rival for the affections of a woman the brother was pursuing. In the second robbery, Phillips "was motivated to steal money to give to his family before he was sent to prison for the first offense," the judge said.

"Both incidents, while marred by the poor judgment of a 21-year-old, reflect Phillips' desire to help his family," Dearie said.  » Page 6

**Online**

✈ The Eastern District decision is posted at **nylj.com.**

8/11/15

« Continued from page 1

"They do not suggest a pattern of future criminality."

Phillips was sentenced to 13½ years on the robbery charges. While incarcerated, the government moved to deport him under a statute that required deportation of non-citizens convicted of a serious crime.

But at the time of the deportation hearing in 1997, Phillips had not served five years and was thus eligible under the since-repealed statute to seek to remain.

Under case law at the time, an inmate could ask an immigration judge to balance his criminal history "with the social and humane considerations" to determine whether barring deportation was "in the best interests of this country," Dearie said.

Phillips' 1997 hearing, at which he appeared pro se, was stopped when the immigration judge erroneously told him "there is no relief that I'm aware of … that would allow you to stay in this country legally." Phillips' attempt to reopen his case in 2001 failed.

He was deported to Jamaica after being paroled in 2004 and he then returned to Brooklyn illegally in 2006.

Since his return, Phillips married, was employed in the construction trades, paid taxes, had three children and "was even called for jury duty," Dearie noted.

Phillips established his own contracting company which prospered when Hurricane Sandy increased the need for home repairs.

In an affidavit submitted to the court, Phillips said he was "able to purchase my first truck, my credit score came up to 790, and we started to look to buy a house. Together, we are breaking the generational cycle with my children, they are growing up to be productive members of society."

In early 2013, Phillips applied for citizenship. Dearie's opinion required him to submit fingerprints. When the prints were entered in the state database, it revealed Phillips to be in the country illegally.

In September 2013, while walking his son to his grade school, Immigration and Customs Enforcement agents arrested him. He was denied bail and remains incarcerated.

In a letter to Dearie, Phillips' nine-year-old son, Shanado



**Judge Dearie**

Phillips Jr., said "the policeman told me that he was going to send my daddy home after he talked to him, but he was not telling me the truth."

Phillips' wife, Geraldine, recounted the devastating impact her husband's arrest had on the family. Their third child, born shortly after the arrest, required surgery and a six-month stay in intensive care.

Medical expenses of more than $10,000 have forced the family onto public assistance, she said. "It is very much difficult for me to watch as our children lose hope in life, in love, in everything that was important to them," she said. "All the sparkles are now gone from their eyes."

Dearie held a "Copeland" hearing July 7, required under *United States v. Copeland*, 376 F.3d 61 (2d Cir. 2004), to determine if Phillips would have been granted residency had his case been heard in 1997.

Ten witnesses testified on Phillips' behalf and Dearie noted that the courtroom, with its 30 to 40 seats, was "filled with Mr. Phillips' supporters."

Phillips also testified. Dearie asked him several questions to determine the quality of legal representation he received in his criminal cases.

"What actually occurred during the *Copeland* hearing was anything but expected," the judge wrote.

"The witnesses called were people of genuine substance, who spoke without hyperbole, generalization, or cliché," Dearie said in his opinion. "They offered valuable insight into the defendant's character and his standing and significance in the family and broader community. In sum, the court concludes that under the full range of circumstances presented, Phillips's brief foray into crime when barely in his twenties should not have such a devastating impact on so many good people, as well as the defendant himself."

Solo Ying Stafford represented Phillips pro bono.

Stafford, who often is appointed counsel for indigent defendants in federal capital cases, said she learned of this case from defendants being held in federal detention. "When I spoke with Shanado and then met his family, I found his story very compelling."

Stafford said the government can still seek to deport Phillips and appeal Dearie's ruling. She said she will seek bail while his case is pending.

Phillips never sought citizenship after his parents obtained permanent residency for him, Stafford said, even though he was automatically entitled to receive it after five years in the country. He believed he was a U.S. citizen when he was arrested on the armed robbery charges. "He thought if you are in the U.S. for an extended period that you are a citizen," Stafford said.

Eastern District Assistant U.S. Attorney Matthew Miller argued for the U.S. Attorney's Office, which declined to comment.

@ *Ben Bedell can be reached at bbedell@alm.com. Twitter: @BenjaminBedell*

Renew your subscription by phone! Call the New York Law Journal at 1-877-256-2472.

**EXHIBIT C**

# Man Fighting Deportation
# Wins Evidentiary Hearing

**BY BEN BEDELL**

A MAN fighting a deportation order triggered by a 15-year-old misdemeanor drug conviction has been granted an evidentiary hearing by a Manhattan judge.

Julio Morales brought a CPL §440 motion to vacate his conviction, claiming his attorney at the time erroneously told him his guilty plea could not be used as a basis for deportation.

Criminal Court Judge Louis Nock said Morales had shown a basis for the ineffective assistance claim because had Morales "known the true, adverse immigration consequences" of taking his lawyer's advice to plead guilty, he would not have done so.

Morales, a citizen of the Dominican Republic, was a lawful permanent resident when he was arrested in May 1998 for buying drugs in a street transaction. He was charged with a felony.

On advice of his attorney, Morales pleaded guilty to a misdemeanor and was sentenced to time served.

Morales "attests that his prior counsel affirmatively misinformed him that a plea of guilty to the class A misdemeanor criminal charge of Criminal Possession of a Controlled Substance in the Seventh Degree would not render him subject to removal," said Nock.

Nock said that he had to judge the claims in light of New York Court of Appeals decisions defining ineffective assistance with respect to immigration status consequences as of the time the advice was given in 1998.

"At that time, non-advice regarding immigration consequences was not deemed ineffective,

Judge Nock

whereas misadvice was," Nock said, citing *People v Ford*, 86 NY2d 397, 405 (1995).

Morales had provided enough facts to justify holding a hearing on a misadvice claim, the judge found.

Nock noted that Morales' counsel who allegedly gave the inaccurate advice had refused to voluntarily supply an account of his conduct in connection with Morales' CPL 440 motion to vacate.

The judge also credited Morales' claim that the evidence against him in the drug sale case was weak. "Neither drugs nor buy money were found on defendant's person when he was arrested," » Page 9

**Online**

🔲 The Manhattan Criminal Court decision is posted at nylj.com.

9-8-15.

# Deport

« Continued from page 1

Nock noted in *People v. Morales*, No. 98N042944.

Morales' co-defendant, the alleged seller, pleaded guilty "to the mere violation of [Penal Law] §240.20, Disorderly Conduct, bearing no immigration consequence," Nock said.

Nock ordered an evidentiary hearing at which Morales will be entitled to gain testimony by subpoena from the attorney who represented him in the drug charge.

Morales "has made a sufficient showing that there appear to be 'nonrecord' material facts that could entitle him to relief, especially in light of the qualitative disparity between defendant's and his co-defendant's pleas," Nock said.

Jorge Guttlein, of Jorge Guttlein & Associates, represented Morales on the CPL 440 motion. He could not be reached for comment.

The lawyer who represented him in the original case is not identified in Nock's decision.

The Manhattan District Attorney's office was represented by Assistant District Attorney Brian Rodriguez. The office declined comment.

@ Ben Bedell can be reached at bbedell@alm.com. Twitter: @BenjaminBedell



SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

         Respondent,

   -against-

JOSE DEJESUS GRANADOS,

        Defendant-Appellant.
------------------------------------------------------------X
STATE OF NEW YORK )
          ss.:
COUNTY OF NASSAU )

**AFFIDAVIT OF SERVICE**

Ind. No. 2400N/09

   I, Ellen Luxmore, being duly sworn deposes and says:  I am not a party to the above-caption action; I am over 18 years of age and reside in Baldwin, New York.

   On September 23,  2015, I served the within **Reply Affirmation** by mailing a true copy of same in a sealed envelope, with postage prepaid thereon in a post office or official depository of the U.S. Postal Service within the State of New York, to the following persons set forth below:

Madeline Singas
Acting District Attorney
262 Old Country Road
Mineola, New York 11501

                _____
                ELLEN LUXMORE

Sworn to before me this

23rd  day of September, 2015

_____
  Notary Public

    JEAN M. LAGRASTA
  Notary Public, State of New York
     No. 30-4669304
   Qualified In Nassau County
  Commission Expires Oct. 31. 2018

EL001523423US